FILED
2026 Sep-08 AM 11:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| PATRICIA CALVERT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 5:25-cv-01215-NAD |
| | ) | |
| SOCIAL SECURITY ADMINISTRATION, COMMISSIONER | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**
**AFFIRMING THE DECISION OF THE COMMISSIONER**

Pursuant to 42 U.S.C. § 405(g), Plaintiff Patricia Calvert appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") on her claim for disability insurance benefits (DIB). Doc. 1. Plaintiff Calvert initially applied for benefits with an alleged onset date of June 1, 2014 (Doc. 8-4 at 3), but later amended her alleged onset date of disability to August 29, 2019 (Doc. 8-3 at 38). The Commissioner denied Calvert's claim for benefits. Doc. 8-3 at 24. In this appeal, the parties consented to magistrate judge jurisdiction. Doc. 11; 28 U.S.C. § 636(c)(1); Fed. R. Civ. P. 73.

After careful consideration of the parties' submissions, the relevant law, and the record as a whole, the court **AFFIRMS** the Commissioner's decision.

## ISSUE FOR REVIEW

In this appeal, Calvert argues that the Administrative Law Judge (ALJ) did not properly evaluate the credibility of Calvert's complaints of pain consistent with the Eleventh Circuit pain standard. Doc. 14 at 5–11.

## STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). To qualify for disability benefits, a claimant must show disability, which is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1505.

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Social Security Administration (SSA) reviews an application for disability benefits in three stages: (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled. The ALJ must determine the following:

(1) whether the claimant is engaged in substantial gainful activity;

(2) if not, whether the claimant has a severe impairment or combination of impairments;

(3) if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;

(4) if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and,

(5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore*, 405 F.3d at 1211. At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). If the

Commissioner makes that showing, the burden then shifts back to the claimant to show that he cannot perform those jobs. *Id.* So, while the burden temporarily shifts to the Commissioner at step five, the overall burden of proving disability always remains on the claimant. *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act. The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.** With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the Commissioner. *Winschel*, 631 F.3d at 1178 (citation and quotation marks omitted); *see Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (similar). If the ALJ's decision is supported by substantial

evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). "The ALJ must rely on the full range of evidence . . . , rather than cherry picking records from single days or treatments to support a conclusion." *Cabrera v. Commissioner of Soc. Sec.*, No. 22-13053, 2023 WL 5768387, at *8 (11th Cir. Sept. 7, 2023).

**B.** With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. And the Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991).

## BACKGROUND

### A. Procedural background

On November 4, 2022, Calvert applied for disability insurance benefits (DIB), alleging disability due to disorders of the skeletal spine and osteoarthrosis and allied disorders. Doc. 8-4 at 2. Calvert initially alleged a disability onset date of June 1, 2014. Doc. 8-4 at 3.

Calvert's application was denied at the initial level (and on reconsideration). Doc. 8-4 at 7, 14. Following the initial denial of her claim, Calvert requested a hearing before an ALJ. Doc. 8-5 at 25. After Calvert agreed to appear by telephone (Doc. 8-5 at 17–18), the ALJ held a telephonic hearing on April 30, 2024 (Doc. 8-3 at 11). At the hearing, Calvert amended her alleged onset date of disability to August 29, 2019. Doc. 8-3 at 38. On June 21, 2024, the ALJ entered an unfavorable decision. Doc. 8-3 at 24.

The Appeals Council denied Calvert's request for review. Doc. 8-3 at 2. Because the Appeals Counsel found no reason to review the ALJ's decision, the ALJ's decision became the final decision of the Commissioner on May 30, 2025. Doc. 8-3 at 2; *see* 42 U.S.C. § 405(g).

### B. Factual background and ALJ hearing

Calvert was born on January 19, 1966. Doc. 8-4 at 3.

On June 14, 2016, Calvert attended a follow-up appointment with Dr. David

Shupe. Doc. 8-9 at 6. Calvert was assessed for hypertension, irritable bowel syndrome, lumbago, and left carpal tunnel syndrome. Doc. 8-9 at 7. Dr. Shupe provided Calvert with a "note for her work saying that she may have to use the bathroom frequently." Doc. 8-9 at 7; *see* Doc. 8-9 at 21. Dr. Shupe also provided a work excuse, which stated that Calvert could return to work on June 15, 2016. Doc. 8-9 at 22.

On March 8, 2018, Calvert presented to Cullman Regional for imaging of the lumbosacral spine for low back pain. Doc. 8-10 at 125. Findings included no acute abnormality and evidence of multilevel degenerative disc disease and osteoarthritis. Doc. 8-10 at 125.

On April 25, 2019, Calvert presented to Internal Medicine Associates of Cullman for rib and lateral chest wall pain. Doc. 8-12 at 5. Calvert reported a "sharp burning pain" "along her left chest wall" that was "worse with coughing, deep breathing, turnin[g] or moving or sitting." Doc. 8-12 at 5. Calvert reported that she had "mid back pain that has been persistent for a lengthy period of time." Doc. 8-12 at 5. Calvert's physical exam showed "pain on palpation along the costal margin." Doc. 8-12 at 7.

On June 13, 2019, Calvert presented to Cullman Regional for imaging of the dorsal spine. Doc. 8-10 at 128. Findings included "no disc herniation or significant bulge," "[c]entral bony spinal canal appears adequately patent," "[no] evidence of

cord compression," and "[i]ncluded paraspinal soft tissues unremarkable." Doc. 8-10 at 128.

On August 29, 2019, Calvert presented to Internal Medicine Associates of Cullman for a follow-up appointment. Doc. 8-11 at 89. Calvert reported dizziness, night sweats, trouble sleeping, depression, and pain from carpal tunnel. Doc. 8-11 at 89. Calvert was assessed for fatigue, Type 2 diabetes mellitus without complications, polyarthritis, hypertension, fibromyalgia, dysthymic disorder, and opioid dependence. Doc. 8-11 at 92.

On September 10, 2019, Calvert presented to Cullman Urology for kidney stones and urinary tract infections. Doc. 8-10 at 182. Calvert reported chronic back pain. Doc. 8-10 at 182.

On October 30, 2019, Calvert presented to Dr. Timothy Shaw with a cough. Doc. 8-10 at 81. Calvert was diagnosed with bronchitis. Doc. 8-10 at 83.

On November 27, 2019, Calvert presented to Internal Medicine Associates of Cullman for a follow-up appointment. Doc. 8-11 at 84. Calvert reported that she was "not doing good," and that her "nerves [were] shot." Doc. 8-11 at 84. Calvert was assessed for venous insufficiency, Vitamin D deficiency, chronic pain syndrome, hypertension, Type 2 diabetes mellitus without complications, irritable bowel syndrome, migraines, dysthymic disorder, morbid obesity, intervertebral disc degeneration, opioid dependence, and fatigue. Doc. 8-11 at 87–88.

On December 31, 2019, Calvert presented to Cullman Urology for a follow-up appointment for urinary tract infections. Doc. 8-10 at 178.

On February 26, 2020, Calvert presented to Internal Medicine Associates of Cullman for a follow-up appointment. Doc. 8-12 at 42. Calvert reported concerns about having shingles and about her blood pressure. Doc. 8-12 at 42. Calvert was assessed for Type 2 diabetes mellitus without complications, chronic pain syndrome, fibromyalgia, hypertension, gastro-esophageal reflux disease, migraines, dysthymic disorder, mixed hyperlipidemia, venous insufficiency, vitamin D deficiency, and dermatitis. Doc. 8-12 at 27.

On May 27, 2020, Calvert presented to Internal Medicine Associates of Cullman for a follow-up appointment. Doc. 8-12 at 36. Calvert reported frequent urinary tract infections. Doc. 8-12 at 36. Calvert was assessed for Type 2 diabetes mellitus without complications, chronic pain syndrome, hypertension, irritable bowel syndrome, obesity, fibromyalgia, dysthymic disorder, radiculopathy, intervertebral disc degeneration, and venous insufficiency. Doc. 8-12 at 39–40.

On May 20, 2020, Calvert presented to Cullman Urology for a urinary tract infection. Doc. 8-10 at 171.

On July 2, 2020, Calvert presented to the Surgery Center of Cullman for an EGD and colonoscopy. Doc. 8-15 at 7. Cullman's postoperative diagnoses were rectal mass, rectal polyps, and diverticulosis. Doc. 8-15 at 7.

On July 16, 2020, Calvert presented to the Surgery Center of Cullman for a transanal resection of rectal mass. Doc. 8-15 at 8.

On July 23, 2020, Calvert presented to Cullman Urology for a urinary tract infection. Doc. 8-10 at 164.

On August 27, 2020, Calvert presented to Internal Medicine Associates of Cullman for a follow-up appointment. Doc. 8-12 at 31. Calvert reported that she had a colonoscopy in July that resulted in the removal of a rectal mass. Doc. 8-12 at 25. Calvert reported that she was having pain with walking and activity, and that she was taking Phenergan for nausea. Doc. 8-12 at 31. Calvert reported elevated blood glucose, migraines, and chronic pain. Doc. 8-12 at 31. Calvert was assessed for Type 2 diabetes mellitus with hyperglycemia, nausea, chronic pain syndrome, hypertension, obesity, fibromyalgia, gastro-esophageal reflux disease, migraines, dysthymic disorder, mixed hyperlipidemia, and venous insufficiency. Doc. 8-12 at 35.

On October 1, 2020, Calvert presented to the Surgery Center of Cullman for a flexible sigmoidoscopy and resection of rectal mass. Doc. 8-15 at 9.

On October 19, 2020, Calvert presented to Cullman Urology for a urinary tract infection. Doc. 8-10 at 159.

On November 30, 2020, Calvert presented to Internal Medicine Associates of Cullman for a follow-up appointment. Doc. 8-12 at 25. Calvert reported that she

had three colonoscopies "to address multiple large polyps." Doc. 8-12 at 25. Calvert was assessed for Type 2 diabetes mellitus with hyperglycemia, chronic pain syndrome, hypertension, irritable bowel syndrome, obesity, gastro-esophageal reflux disease, migraines, dysthymic disorder, mixed hyperlipidemia, chronic cystitis, thrombocytopenia, and polyarthritis. Doc. 8-12 at 28–29.

On April 30, 2024, the ALJ held a telephonic hearing on Calvert's application for benefits. Doc. 8-3 at 36. At the hearing, Calvert amended her alleged onset date to August 29, 2019. Doc. 8-3 at 38.

Calvert testified that she graduated from high school and attended one semester of college. Doc. 8-3 at 39. Calvert testified that she watches her six-year-old grandchild from the time he gets home from school until his mother gets home from work. Doc. 8-3 at 40.

Calvert also testified that in 2019 and 2020, her carpal tunnel syndrome prevented her from working because she could not use her left hand. Doc. 8-3 at 40. Calvert testified that she "can't get down on [her] knees to stock or clean or anything," and that her "leg swells." Doc. 8-3 at 40. Calvert testified that she has "terrific back pain." Doc. 8-3 at 40.

Calvert testified further that she previously worked cleaning houses, but that she had to stop cleaning because she "couldn't go up and down the stairs." Doc. 8-3 at 40–41. Calvert testified that, before she worked cleaning houses, she worked as

a cashier and as a pharmacy tech. Doc. 8-3 at 47. Calvert testified that during 2019 and 2020 she could stand for "maybe an hour, hour and a half" total during the day, and that she could only stand for "maybe 15 minutes" at one time. Doc. 8-3 at 41. Calvert testified that she could lift and carry less than ten pounds and could walk "less than half a block." Doc. 8-3 at 41–42.

Calvert rated her pain during 2019 and 2020 as an eight out of ten. Doc. 8-3 at 42. Calvert testified that she received muscle relaxers, narcotic pain medication, and gabapentin to help manage her pain. Doc. 8-3 at 42. Calvert testified that she "sat in the recliner" for around six hours from 8:00 a.m. to 5:00 p.m. Doc. 8-3 at 42.

Calvert testified that she also had trouble with irritable bowel syndrome, grogginess from medication, her kidneys, anxiety, depression, and migraines. Doc. 8-3 at 42, 47.

Calvert also testified that she drove a car in 2019 and 2020 and still "occasionally drive[s]." Doc. 8-3 at 44. Calver testified that, during the relevant time period, she "did the grocery shopping" and was able to dress herself. Doc. 8-3 at 44.

Calvert testified further that in 2019 and 2020 she spent most of her days sitting at home, but that she could load the dishwasher, sweep, vacuum "a little at a time," and cook for her husband "sporadically." Doc. 8-3 at 45.

Vocational Expert (VE) Dr. Robert John Beadles, Jr. testified that a

hypothetical individual with Calvert's age, education, work experience, and the limitations posed by the ALJ could perform jobs that exist in significant numbers in the national economy. Doc. 8-3 at 50–53.

**C. ALJ decision**

On June 21, 2024, the ALJ entered an unfavorable decision. Doc. 8-3 at 11–24. In the decision, the ALJ concluded that Calvert "was not under a disability, as defined in the Social Security Act, at any time from August 29, 2019, the amended alleged onset date, through June 30, 2020, the date last insured." Doc. 8-3 at 24.

The ALJ applied the five-part sequential test for disability (*see* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Winschel*, 631 F.3d at 1178). Doc. 8-3 at 12–13. The ALJ found that Calvert did not engage in substantial gainful activity during the period from her amended alleged onset date of August 29, 2019, through her date last insured of June 30, 2020. Doc. 8-3 at 13. The ALJ found that, through the date last insured, Calvert had the severe impairments of degenerative disc disease of the lumbar spine and obesity. Doc. 8-3 at 13.

As to Calvert's medically determinable impairments, the ALJ found that Calvert's irritable bowel syndrome, diabetes, carpal tunnel syndrome, degenerative joint disease, migraines, mitral valve prolapse, hypertension, and recurrent kidney stones, and urinary tract infections "create no more than minimal work-related limitations and, therefore, are non-severe impairments." Doc. 8-3 at 13–14.

The ALJ found that Calvert's fibromyalgia, anxiety, and depression were non-medically determinable impairments. Doc. 8-3 at 14. The ALJ found that "the medical evidence of record does not contain any documented findings of the clinical signs or symptoms associated with a diagnosis of fibromyalgia." Doc. 8-3 at 14–15. The ALJ also found that, while the record "showed some complaints of anxiety and depression," the record "was insufficient for establishing either as a medically determinable impairment during the period at issue." Doc. 8-3 at 15. The ALJ found that "the record did not contain any formal, consistent mental health treatment from a mental health professional or a diagnosis of anxiety and depression from a mental health professional." Doc. 8-3 at 15.

The ALJ also found that Calvert has no limitation in understanding, remembering, or applying information, and that Calvert has no limitation in interacting with others. Doc. 8-3 at 15. The ALJ found that Calvert has no limitation with regard to concentrating, persisting, or maintaining pace, and that Calvert has no limitation in adapting or managing oneself. Doc. 8-3 at 15.

The ALJ found further that Calvert did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the applicable Social Security regulations. Doc. 8-3 at 16.

The ALJ then determined Calvert's residual functional capacity (RFC), finding that Calvert could perform "light work" as defined in the regulations, except

that she could occasionally lift and/or carry, including upward pulling of 20 pounds; could frequently lift and/or carry including upward pulling of 10 pounds; could sit for 6 hours in an 8-hour workday with normal breaks; could stand and/or walk with normal breaks for 6 hours in an 8-hour workday; could push and/or pull, including operation of hand or foot controls, without limits, up to the lift and carry restrictions of 20 and 10 pounds; could not work on ladders, ropes, scaffolds, unprotected heights, or around dangerous machinery; could occasionally climb ramps and stairs, stoop, kneel, crouch, crawl, and balance; could not work on unlevel terrain or slippery surfaces; and could frequently handle. Doc. 8-3 at 17.

In assessing Calvert's RFC and the extent to which her symptoms limited her function, the ALJ stated that the ALJ "must follow" the required "two-step process": (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities." Doc. 8-3 at 17–18. The ALJ also stated that, "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the ALJ "must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities." Doc. 8-3 at 18.

In finding Calvert's RFC, the ALJ considered information from Calvert's medical records and hearing testimony regarding the limitations from her impairments, including Calvert's testimony that she was "unable to work because of debilitating pain." Doc. 8-3 at 18. The ALJ considered Calvert's testimony that "she felt unable to go upstairs to clean multilevel homes" and that she "noted pain when bending over." Doc. 8-3 at 18. The ALJ considered Calvert's testimony that "she could only stand for 1 to 1.5 hours, sit for 15 minutes, lift less than 10 pounds, and walk less than half a block." Doc. 8-3 at 18. The ALJ considered Calvert's testimony that "she was in a recliner for approximately 6 hours per day during the period at issue (2019 to 2020)." Doc. 8-3 at 18.

After considering the record and subjective allegations, the ALJ found that Calvert's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that Calvert's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Doc. 8-3 at 18.

The ALJ summarized the evidence underlying the ALJ's decision, finding that the medical evidence shows that Calvert "could perform work-related activities within the confines of the above-described residual functional capacity during the period at issue." Doc. 8-3 at 18. The ALJ found that Calvert "had treatment both prior to her alleged onset date of disability as well as after her date last insured

expired." Doc. 8-3 at 18. The ALJ found that, in April 2019, Calvert "reported mid back pain that had been persistent of a lengthy period of time," but on examination Calvert "had pain on palpation along the costal margin but otherwise unremarkable." Doc. 8-3 at 18. The ALJ found that on June 13, 2019, "imaging of the lumbar spine showed no disc herniation or significant disc bulge, central bony spinal canal appeared adequately patent, no evidence of cord compression, and unremarkable paraspinal soft tissues." Doc. 8-3 at 18–19.

The ALJ found that on August 29, 2019, the same date as Calvert's amended alleged onset date of disability, Calvert presented for a follow-up appointment for various conditions, stating that "she had been OK except for some dizziness that she attributed to not eating lunch." Doc. 8-3 at 19. The ALJ found that Calvert "reported not sleeping well . . . and tried taking muscle relaxers for her back but that it did not help her sleep." Doc. 8-3 at 19. The ALJ found that, despite these reports, "examination notes were unremarkable," and on examination Calvert "was in no acute distress" and her "motor movements were symmetrical without paralysis and grossly observed." Doc. 8-3 at 19. The ALJ found that, during the period of time at issue, "it does not appear that the claimant sought orthopedic treatment related to her alleged disabling back issues." Doc. 8-3 at 19.

The ALJ also found that Calvert "had some limited treatment throughout 2020," but that the "examination notes were also largely unremarkable." Doc. 8-3

at 19. The ALJ found that, in February 2020, Calvert presented to Internal Medicine Associates of Cullman, but "she presented regarding non-severe or acute conditions and made no mention of any debilitating back-related complaints." Doc. 8-3 at 19. The ALJ found that the record "contained normal physical findings." Doc. 8-3 at 19.

The ALJ found further that, in May 2020, Calvert again presented to Internal Medicine Associates of Cullman, but that she "made no back- related complaints." Doc. 8-3 at 19. The ALJ found that, on examination, Calvert "was in no acute distress" and had no edema, swelling, redness, tenderness in the extremities, or abnormal neurological findings. Doc. 8-3 at 19.

The ALJ found that during an appointment at Internal Medicine Associates of Cullman on February 26, 2020, Calvert's physical and mental examinations were normal. Doc. 8-3 at 19.

The ALJ also found that Calvert's obesity "further complicat[es] her ability to perform work-related activities." Doc. 8-3 at 20. The ALJ "accounted for [Calvert's] obesity in connection with her back-related issues and limited [Calvert] to a reduced range of light work." Doc. 8-3 at 20. The ALJ found that the "very limited medical evidence of record during the period at issue does not support further limiting the claimant." Doc. 8-3 at 20.

The ALJ found "no indication in the record that [Calvert] has sought [medical]

care and had been turned down for financial reasons," and that the record "fails to show [Calvert] sought or contacted any local Free Clinic or a reduced fee clinic." Doc. 8-3 at 20.

The ALJ found that, at the initial and reconsideration levels, the state agency consultants found insufficient evidence to properly evaluate Calvert's claim. Doc. 8-3 at 21.

The ALJ also found that Dr. David Shupe opined that Calvert "may need frequent bathroom breaks," and that Dr. Shupe provided "an accompanying Return to Work or School form that was dated June 14, 2016, stating that [Calvert] could return to work on June 15, 2016." Doc. 8-3 at 21. The ALJ found Dr. Shupe's opinion unpersuasive, as "there was no objective evidence to suggest that [Calvert] would need frequent bathroom breaks." Doc. 8-3 at 21.

The ALJ then found that, through the date last insured, Calvert was capable of performing past relevant work. Doc. 8-3 at 22.

After considering Calvert's age, education, work experience, RFC, and the testimony of the VE, the ALJ found that Calvert could perform jobs that exist in significant numbers in the national economy. Doc. 8-3 at 22–24. The ALJ found that Calvert "was not under a disability, as defined in the Social Security Act, at any time from August 29, 2019, the amended alleged onset date, through June 30, 2020, the date last insured." Doc. 8-3 at 24.

## DISCUSSION

Having carefully considered the record and briefing, the court concludes that the ALJ's decision was supported by substantial evidence and based on proper legal standards. Calvert argues in her brief that the ALJ "did not properly evaluate her claim under the Eleventh Circuit pain standard," and that the "record does not contain substantial evidence to support the ALJ's negative credibility determination as it pertains to [the ALJ's] conclusion that [Calvert] can perform a range of light work." Doc. 14 at 5. But the ALJ properly assessed Calvert's subjective testimony regarding her impairments and associated symptoms, as the ALJ's decision was based on the multi-part "pain standard," and substantial evidence supports the ALJ's decision not to fully credit Calvert's subjective testimony regarding her symptoms.

### I. The ALJ's decision properly was based on the multi-part "pain standard."

As an initial matter, the ALJ's decision properly was based on the multi-part "pain standard." When a claimant attempts to establish disability through his own testimony concerning pain or other subjective symptoms, the multi-step "pain standard" applies. That "pain standard" requires (1) "evidence of an underlying medical condition," and (2) either "objective medical evidence confirming the severity of the alleged pain" resulting from the condition, or that "the objectively determined medical condition can reasonably be expected to give rise to" the alleged symptoms. *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *see also*

*Raper v. Commissioner of Soc. Sec.*, 89 F.4th 1261, 1277 (11th Cir. 2024); 20 C.F.R. § 416.929 (standards for evaluating pain and other symptoms).

Then, according to both caselaw and the applicable regulations, an ALJ "will consider [a claimant's] statements about the intensity, persistence, and limiting effects of [her] symptoms," and "evaluate [those] statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether [the claimant is] disabled." 20 C.F.R. § 416.929(c)(4); *see Hargress v. Soc. Sec. Admin., Comm'r*, 883 F.3d 1302, 1307 (11th Cir. 2018).

Here, in analyzing Calvert's RFC, the ALJ stated that the ALJ "must follow a two-step process": (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities." Doc. 8-3 at 17–18. According to the ALJ, where the claimant's statements about the intensity, persistence, or limiting effects of symptoms were not substantiated by objective medical evidence, the ALJ "must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities." Doc. 8-3 at 18.

The ALJ then applied the two-part test and found first that Calvert's medically

determinable impairments could reasonably be expected to cause the alleged symptoms. Doc. 8-2 at 18. The ALJ then found second that Calvert's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Doc. 8-3 at 18. Thus, the ALJ's decision was based on the proper legal standards.

## II. Substantial evidence supports the ALJ's decision to partially discredit Calvert's subjective testimony regarding her impairments and associated symptoms.

Furthermore, substantial evidence supports the ALJ's decision not to fully credit Calvert's subjective testimony regarding her impairments and associated pain and symptoms.

### A. The Eleventh Circuit requires that an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony.

Under controlling Eleventh Circuit law, an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony. *Wilson*, 284 F.3d at 1225. A claimant can establish that he is disabled through his "own testimony of pain or other subjective symptoms." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).

An ALJ "will not reject [the claimant's] statements about the intensity and persistence of [her] pain or other symptoms or about the effect [those] symptoms have" on the claimant's ability to work "solely because the available objective

medical evidence does not substantiate [those] statements." 20 C.F.R. § 416.929(c)(2).

So, when an ALJ evaluates a claimant's subjective testimony regarding the intensity, persistence, or limiting effects of her symptoms, the ALJ must consider all of the evidence, objective and subjective. 20 C.F.R. § 416.929. Among other things, the ALJ considers the nature of the claimant's pain and other symptoms, her precipitating and aggravating factors, her daily activities, the type, dosage, and effects of her medications, and treatments or measures that she has to relieve the symptoms. *See* 20 C.F.R. § 416.929(c)(3).

Moreover, the Eleventh Circuit has been clear about what an ALJ must do, if the ALJ decides to discredit a claimant's subjective testimony "about the intensity, persistence, and limiting effects of [her] symptoms." *See* 20 C.F.R. § 416.929(c)(4). If the ALJ decides not to credit a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

"A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995); *see Mitchell v. Commissioner of Soc. Sec.*, 771 F.3d 780, 792 (11th Cir. 2014) (similar). "The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection

which is not enough to enable . . . [a reviewing court] to conclude that the ALJ considered [the claimant's] medical condition as a whole." *Dyer*, 395 F.3d at 1210 (quotation marks and alterations omitted).[1] "The question is not . . . whether [the] ALJ could have reasonably credited [the claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Commissioner of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

### B. The ALJ properly explained the decision not to fully credit Calvert's subjective testimony regarding her symptoms, and substantial evidence supports that decision.

The ALJ properly explained the decision to partially discredit Calvert's subjective testimony regarding her pain and symptoms, and substantial evidence supports the ALJ's decision.

In her brief, Calvert argues that the "record does not contain substantial evidence to support the ALJ's negative credibility determination as it pertains to [the ALJ's] conclusion that [Calvert] can perform a range of light work." Doc. 14 at 5.

[1] The Social Security regulations no longer use the term "credibility," and have shifted the focus away from assessing an individual's "overall character and truthfulness"; instead, the regulations now focus on "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and[,] given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Hargress*, 883 F.3d at 1308 (quoting Social Security Ruling 16-3p, 81 Fed. Reg. 14166, 14167, 14171 (March 9, 2016)). But, generally speaking, a broad assessment of "credibility" still can apply where the ALJ assesses a claimant's subjective complaints about symptoms and consistency with the record. *Id.* at 1308 n.3.

But the ALJ considered the record as a whole, and substantial evidence supports both the ALJ's finding that Calvert's testimony was not entirely consistent with the record evidence and the ALJ's RFC finding of light work with limitations.

The ALJ made an explicit finding that Calvert's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." Doc. 8-3 at 18. The ALJ provided a detailed analysis of the record medical evidence regarding Calvert's pain, taking into consideration Calvert's treatment records, medical opinions, and prior administrative medical findings. Doc. 8-3 at 18–22. The ALJ then found that the "medical findings do not support the existence of limitations greater than the above listed residual functional capacity." Doc. 8-3 at 22.

The ALJ considered the totality of the evidence. Doc. 8-3 at 18–22. The ALJ considered that Calvert "had treatment both prior to her alleged onset date of disability as well as after her date last insured expired." Doc. 8-3 at 18. The ALJ considered that at a follow-up appointment for various conditions on August 29, 2019, Calvert "reported that she recently stopped cleaning houses due to feeling that she was unable to go up and down stairs in the houses she was cleaning, which was consistent with her hearing testimony." Doc. 8-3 at 19. But the ALJ found that "examination notes were unremarkable," as Calvert "was in no acute distress" and her "motor movements were symmetrical without paralysis and grossly observed."

Doc. 8-3 at 19. The ALJ also considered that, in April 2019, Calvert "reported mid back pain that had been persistent for a lengthy period of time," but that on examination "she had pain on palpation along the costal margin but otherwise unremarkable." Doc. 8-3 at 19. The ALJ considered imaging of the lumbar spine from June 13, 2019, which "showed no disc herniation or significant bulge, central bony spinal canal appeared adequately patent, no evidence of cord compression, and unremarkable paraspinal soft tissues." Doc. 8-3 at 18–19.

The ALJ found that Calvert had "very limited medical evidence of record during the period at issue." Doc. 8-3 at 20. The ALJ considered Calvert's lack of orthopedic treatment records, finding that "it does not appear that [Calvert] sought orthopedic treatment related to her alleged disabling back issues." Doc. 8-3 at 19. The ALJ also found "no indication in the record that [Calvert] has sought care and had been turned down for financial reasons." Doc. 8-3 at 20. The ALJ considered records from four state agency medical consultants, who all "found insufficient evidence to properly evaluate the claim," and none of whom "provided a residual functional capacity analysis." Doc. 8-3 at 21.

The ALJ considered Calvert's obesity, finding that "obesity can cause limitation of function" and "may affect ability to do postural functions." Doc. 8-3 at 19. But the ALJ "accounted for her obesity in connection with her back-related issues and limited [Calvert] to a reduced range of light work" with limitations. Doc.

8-3 at 20.

The ALJ partially credited Calvert's subjective testimony, stating that the ALJ "accounted for some degree of limitation given [Calvert's] subjective statements, imaging reports noting degenerative changes, and her obesity, but the limited records during the period at issue do not support limiting [Calvert] further than found by the [ALJ]." Doc. 8-3 at 20. Calvert testified that she could lift and carry less than ten pounds (Doc. 8-3 at 41), and that she spent "probably six hours" sitting in a recliner daily (Doc. 8-3 at 42). In limiting Calvert's RFC, the ALJ found that Calvert could "frequently lift and/or carry, including upward pulling of 10 pounds," and that she "can sit for 6 hours in an 8-hour workday." Doc. 8-3 at 17.

Further, "[t]he residual functional capacity is an assessment based upon all of the relevant evidence of a claimant's remaining ability to do work despite his impairments." *Lewis*, 125 F.3d 12 1440. And, according to Social Security Ruling 96-8P, "RFC is not the least an individual can do despite his or her limitations or restrictions, but the *most*." 1996 WL 374184 at *2 (July 2, 1996) (emphasis in original).

In this regard, the ALJ's decision considered information based on both objective and subjective evidence, accounting for evidence supporting Calvert's testimony, while also clearly identifying evidence calling into doubt Calvert's subjective testimony about the intensity, persistence, and limiting effects of her

symptoms. *See* 20 C.F.R. § 416.929.

Thus, the ALJ's decision and RFC finding included the necessary "explicit and adequate reasons" for partially discrediting Calvert's subjective testimony about her symptoms. *Wilson*, 284 F.3d at 1225. The ALJ "considered [Calvert's] medical condition as a whole," and the decision was not just a "broad rejection" of Calvert's subjective testimony. *Dyer*, 395 F.3d at 1210.

Substantial evidence requires "such relevant evidence as a reasonable person would accept as adequate to support a conclusion" (*Crawford*, 363 F.3d at 1158), and the court must affirm an ALJ's factual findings if they are supported by substantial evidence, "[e]ven if the evidence preponderates against the Commissioner's findings" (*Crawford*, 363 F.3d at 1158–59 (quoting *Martin*, 894 F.2d at 1529)). This court cannot reweigh the evidence (*see Winschel*, 631 F.3d at 1178), and there is sufficient evidence in the record to support the ALJ's findings that Calvert's testimony regarding her symptoms was not consistent with the record as a whole and that Calvert was able to perform light work with limitations (based on Calvert's own testimony).[2] Accordingly, substantial evidence supports the ALJ's

[2] As a final note, at the end of her brief, Calvert includes—without development—a bare assertion that the ALJ did not fully and fairly develop the record. Doc. 14 at 11. But that is not the case. An ALJ "has a basic duty to develop a full and fair record." *Henry v. Commissioner of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015). However, the claimant ultimately "bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim." *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003); *see also* 20 C.F.R.

decision. The ALJ clearly articulated a credibility finding that was supported by substantial evidence, and the court cannot disturb that finding. *See Foote*, 67 F.3d at 1562.

**CONCLUSION**

For the reasons stated above (and pursuant to 42 U.S.C § 405(g)), the Commissioner's decision is **AFFIRMED**. The court separately will enter final judgment.

**DONE** and **ORDERED** this September 8, 2026.

**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE

§ 416.912(a) ("[I]n general, you have to prove to us that you are . . . disabled. You must inform us about or submit all evidence known to you that relates to whether or not you are . . . disabled."). And, notwithstanding the ALJ's responsibility to develop a "full and fair" record, "there must be a showing of prejudice before it is found that the claimant's right to due process has been violated to such a degree that the case must be remanded." *Graham v. Apfel*, 129 F.3d 1420, 1422–23 (11th Cir. 1997). The Eleventh Circuit has instructed that "[t]he court should be guided by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice." *Graham*, 129 F.3d at 1423 (quotation marks omitted). Here, Calvert has provided no basis for the court to find prejudice and the record contains no clear evidentiary gaps; therefore, Calvert has not shown that the ALJ failed to fully and fairly develop the record.